Filed 8/27/21  P. v. Bayne CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077553 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD270076) |
| ALEXANDRIA MARIE BAYNE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed as modified.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

# I

# INTRODUCTION

Alexandria Marie Bayne drank numerous alcoholic beverages, drove her vehicle while she had a blood alcohol content (BAC) four times the legal driving limit, and crashed head-on into another vehicle, killing the driver of the vehicle. She was found guilty of second degree murder, gross vehicular manslaughter while intoxicated, driving while under the influence of alcohol and causing bodily injury, driving with a BAC of 0.08 or more and causing bodily injury, and driving the wrong way on a divided highway.

The defendant appeals her judgment of conviction. She claims the trial court erred: (1) by excluding evidence she was sexually assaulted as a child, which allegedly caused her to suffer from post-traumatic stress disorder (PTSD) and precluded her from appreciating the risks associated with her actions; (2) by denying her motion to continue the sentencing hearing; (3) by miscalculating the court operations assessment (Pen. Code,[1] § 1465.8) and the conviction assessment (Gov. Code, § 70373) she owes as part of her sentence; and (4) by imposing a $10,000 restitution fine (§ 1202.4, subd. (a)), a stayed $10,000 parole revocation restitution fine (§ 1202.45), and the previously-mentioned court operations and conviction assessments without considering her ability to pay them.

We agree the trial court miscalculated the court operations and conviction assessments the defendant owes as part of her sentence. Therefore, we modify the judgment as follows: the court operations assessment is reduced from $200 to $120, and the conviction assessment is reduced from $150 to $90. We reject the defendant's remaining arguments and affirm the judgment as modified.

---

[1] Further undesignated statutory references are to the Penal Code.

II

BACKGROUND

A

*The Crash*

The tragic events giving rise to these proceedings occurred on December 17, 2016. That day, the defendant drank several alcoholic beverages at various locations, including a restaurant, a bar, and two friends' homes. She drove her vehicle to and from these locations. At several points during the day, the defendant's minor children were with her in the vehicle while she drove.

Near the end of her day of drinking, the defendant drove to a friend's house where she socialized and continued drinking. At about 11:30 p.m., the defendant called her boyfriend and asked him to meet up with her at a bar. The boyfriend noticed the defendant was slurring her speech, warned her not to drive, and offered to pick her up. She declined his offer.

About fifteen minutes later, the defendant left her friend's house and drove her vehicle to a nearby intersection of two major roadways. Two "Do Not Enter" signs were posted warning drivers on one of the roadways not to turn onto an offramp for the other roadway. Despite these signs, the defendant turned her vehicle onto the offramp and began driving the wrong way down the divided roadway. A driver on the roadway repeatedly flashed her headlights and honked her horn to get the defendant's attention. The defendant ignored these warnings, nearly crashed into the vehicle of the person trying to get her attention, and then, while traveling at a speed of 60 miles per hour, crashed head-on into a vehicle that was traveling in the opposite direction at a speed of 57 miles per hour. Sarita Shakya, the driver of the other vehicle, died at the scene of the accident.

The defendant was taken to the hospital where she was treated for her injuries. Blood draws were performed approximately four hours after the accident and showed the defendant had a BAC of 0.27 percent, plus or minus 0.01. A retrograde analysis showed the defendant had a BAC of between 0.27 percent and 0.35 at the time of the accident. A law enforcement criminalist opined the defendant had somewhere between 10 and 13 drinks circulating in her system at the time of the crash.

B

*The First Trial*

The defendant was charged by amended information with one count of second degree murder (§ 187, subd. (a); count 1), one count of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); count 2); four counts of child endangerment (§ 273a, subd. (a); counts 3–6); one count of driving while under the influence of alcohol and causing bodily injury (Veh. Code, § 23153, subd. (a); count 7); one count of driving with a BAC of 0.08 or more and causing bodily injury (*id.*, subd. (b); count 8); and one count of driving the wrong way on a divided highway (*id.*, § 21651, subd. (b); count 9). The information alleged the defendant suffered two prior convictions for driving while under the influence of alcohol (DUI). It also alleged enhancements associated with the charged offenses.

A central disputed issue at trial was whether the defendant harbored the implied malice necessary to be found guilty of second degree murder—i.e., whether she knew her conduct endangered the life of another and acted with conscious disregard for human life. The defense sought to disprove implied malice with evidence the defendant suffered from PTSD, which prevented her from appreciating the degree to which she was impaired the night of the accident. The defense posited the defendant's PTSD was related to sexual

4

assaults perpetrated against her when she was a child, including sexual assaults committed by her brother, a neighbor, and members of her father's motorcycle gang. According to the defense, the defendant's PTSD was triggered when she received a text message from her brother approximately six months before the drunk driving accident. The text message at issue contained a photograph of her brother's genitals.

The defense filed a motion to admit testimony from two experts—psychologist Dr. Raymond Murphy and psychiatrist Dr. Clark Smith. Dr. Murphy interviewed the defendant and administered assessments on her, including the Brief Psychiatric Rating Scale, the Substance Abuse Subtle Screening Inventory, the Personality Assessment Inventory, the Hamilton Rating Scale for Depression, and the Davidson Trauma Scale. Based on his examination and the assessments he administered, Dr. Murphy diagnosed the defendant with major depressive disorder, PTSD, and alcohol use disorder. Dr. Smith interviewed the defendant as well, reviewed Dr. Murphy's psychological evaluation, and diagnosed the defendant with major depressive disorder, PTSD, and alcohol dependence.

In response to the defense's motion, the prosecution moved in limine to exclude or limit the scope of the defense's psychiatric evidence. The prosecution conceded the defense experts could testify they relied on the defendant's interview statements when forming their opinions. However, it argued the experts could not relay those statements to the jury because they were inadmissible hearsay. The prosecution also argued that *any* evidence pertaining to the details of the childhood sexual assaults—including testimony from the defendant—should be excluded because it was irrelevant and "would only be provided to elicit sympathy from the jury." At the hearing

on the parties' motions, the prosecution reiterated its claim that any evidence of the childhood sexual assaults was irrelevant and unduly prejudicial.

The trial court ruled the defense experts could testify concerning their diagnoses of the defendant and the general matter upon which they relied in forming their opinions. However, the court ruled the defense experts could not relay to the jury the out-of-court statements upon which they relied. The court found the defense experts also could not testify whether the defendant harbored implied malice because that was an "ultimate" issue for the jury to decide. Further, on relevance and undue prejudice grounds, the court excluded evidence pertaining to the details of the sexual assaults perpetrated against the defendant when she was a child.

In accordance with these rulings, the defense elicited testimony from the defendant that she experienced certain unspecified trauma as a child, had depression, and received a triggering text message from her brother. The defendant also testified she had approximately eight drinks on the day of the accident. She testified she drove that evening, even after a day of drinking, because she did not feel impaired.

The defense elicited testimony from its experts that they diagnosed the defendant with depression, PTSD, and alcohol use disorder. They testified about the general matter upon which they relied in making their diagnoses. Further, they testified PTSD can impair one's judgment and organized thinking abilities. However, the defense experts were not permitted to testify about whether the defendant harbored implied malice, and no witnesses were permitted to testify about the details of the sexual assaults the defendant experienced as a child.

At the close of trial, the jury was unable to reach a verdict on the second degree murder charge. Eleven jurors voted to find the defendant

6

guilty of murder and one juror voted to find her not guilty of murder. The jury found the defendant guilty of gross vehicular manslaughter while intoxicated, driving while under the influence of alcohol and causing bodily injury, driving with a BAC of 0.08 or more and causing bodily injury, and driving the wrong way on a divided highway, and not guilty as to the remaining charges. The jury also found true various allegations associated with the gross vehicular manslaughter and DUI-related charges.

C

*The Second Trial*

The defendant was retried on the second degree murder charge.

Prior to the retrial, the defense moved in limine to define the scope of its experts' testimony. It argued the court should permit its experts to testify about their diagnoses of the defendant and the characteristics of persons with such diagnoses, as the court had in the initial trial. The defense also sought admission of expert testimony concerning the "source" of the defendant's PTSD and her "mental condition at the time of the offense."

The prosecution urged the court to adopt the evidentiary rulings from the first trial. It argued testimony concerning the details of the childhood sexual assaults—including testimony from the defendant—was irrelevant and subject to exclusion under Evidence Code section 352. It asserted the evidence was "highly prejudicial" and would lead to a "trial within a trial."

The court denied the defense's in limine motion to the extent it sought to expand the scope of the testimony permitted in the first trial. In particular, the court denied the defense's request to admit testimony about whether the defendant acted with implied malice, which the court called "a question of fact for the jury …." The court also found the proffered sexual assault evidence was irrelevant and would produce a "trial within a trial."

7

Thus, the court excluded all testimony about the details of the sexual assaults allegedly perpetrated against the defendant when she was a child.

At the ensuing retrial, it was largely undisputed the defendant consumed several alcoholic beverages on the day of the accident, had a BAC substantially in excess of the legal driving limit, drove the wrong way down a roadway, and caused the head-on crash that killed Sarita Shakya. Like the initial trial, the main disputed issue was whether the defendant acted with implied malice. Therefore, the discussion that follows focuses solely on the implied malice evidence that was introduced during the defendant's retrial.

The prosecution sought to establish implied malice based, in part, on the defendant's prior DUI convictions. It elicited evidence the defendant attended a three-month drinking-and-driving course and a Mothers Against Drunk Driving victim impact panel after her first DUI conviction. It elicited evidence the defendant attended an 18-month drinking-and-driving course after her second DUI conviction. The defendant was repeatedly advised about the dangers of drinking and driving during these programs. She also received numerous *Watson* advisements (see *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*)) informing her she could be charged with murder if she killed someone while driving under the influence of alcohol.

The prosecution also attempted to establish implied malice based on testimony elicited from the defendant's ex-husband. He testified he witnessed the defendant drink heavily on approximately half the days of the year, beginning in the year 2009. He testified he spoke with the defendant approximately 50 times during their 20-year relationship about the dangers of drinking and driving.

Like the initial trial, the defense sought to disprove implied malice largely through the testimony of the defendant and the defense experts. The

8

defendant testified she experienced trauma while growing up and suffered from depression and alcoholism. She testified she received a text message from her brother six months before the accident, which dredged up memories of her trauma and caused her to drink heavily. The defendant testified she did not feel impaired when she left her friend's home the evening of the fatal accident. In accordance with the court's in limine rulings, the court sustained objections to defense questions seeking to elicit testimony from the defendant about whether she was abused as a child and the content of the triggering text message sent by her brother.

Dr. Murphy testified he administered assessments on the defendant, who reported suffering from severe childhood trauma. He testified he diagnosed the defendant with major depressive disorder, PTSD, and alcohol use disorder. He testified a person with PTSD can use alcohol to self-medicate and repress painful memories. Further, he testified a person with depression or substance abuse disorder can have impaired decision making abilities. The defense asked Dr. Murphy why a person with depression, PTSD, and alcohol use disorder might drink and drive after receiving warnings about the dangers of such conduct. He replied the person may be minimizing the seriousness of her alcohol consumption and trying to avoid her problems.

Dr. Smith testified he interviewed the defendant, reviewed Dr. Murphy's psychological report, and reviewed the defendant's arrest records. He testified he diagnosed the defendant with PTSD with dissociation related to an early childhood trauma, alcohol dependence, and major depressive disorder. Further, he testified PTSD can occur when a person suffers a life-threatening trauma or, in the case of sexual assault, severe trauma accompanied by a belief one's life is in danger. According to

9

Dr. Smith, the defendant reported she began drinking six months prior to the accident due to a PTSD trigger. Dr. Smith testified the defendant did not think she was intoxicated on the evening of the crash. He testified it would not surprise him that a person with a BAC between 0.29 and 0.40 could believe she was unimpaired.

After deliberations, the jury found the defendant guilty of the second degree murder of Sarita Shakya.

D

*The Sentencing Hearing*

At the sentencing hearing on March 13, 2020, defense attorney David K. Demergian made an oral request to continue the sentencing proceedings. The defense did not file a written continuance notice, as required by section 1050, subdivision (b), but Demergian argued the defense's procedural noncompliance should be excused because his co-counsel, Michelle Cameron-Hunsaker, had a family member pass away and had just completed a three-week trial. On the merits, Demergian argued a continuance was necessary because Cameron-Hunsaker was ill.[2]

The court found no good cause and denied the continuance request. It noted the defense did not file a written continuance notice under section 1050, subdivision (b), or a statement in mitigation. It noted the parties agreed to the sentencing hearing date just six weeks earlier. Further, it opined that although Cameron-Hunsaker had been in a three-week trial, "she [could have] file[d] a 1050 motion with affidavits and declarations …. She didn't do that." On the merits of the continuance request, the court opined the case had a "long history" spanning back to December 2016. It

---

2    At the time of the defendant's sentencing hearing, COVID-19 cases were beginning to be reported across the United States.

10

noted the defense should have been prepared for sentencing no later than August 7, 2019, when the first jury found the defendant guilty of counts 2, 7, 8, and 9. Finally, the court noted it would be unable to conduct a continued sentencing hearing for an "extended period of time" because the trial judge was scheduled to undergo surgery.

The court proceeded to sentence the defendant, who was represented at the sentencing hearing by Demergian. The court sentenced the defendant to state prison for an indeterminate term of 15 years to life for the count 1 murder conviction; an indeterminate term of 15 years to life for the count 2 gross vehicular manslaughter conviction and an accompanying true finding under section 191.5, subdivision (d); and a determinate term of three years for the count 9 conviction for driving the wrong way on a divided highway. The court dismissed counts 7 and 8 as lesser included offenses of count 2 and stayed punishment for counts 2 and 9 pursuant to section 654. The court imposed various fines and fees discussed in detail below.

III

DISCUSSION

A

*Legal Principles of Murder*

Murder is the unlawful killing of a human being, or a fetus, with malice aforethought. (§ 187, subd. (a).) It is divided into two degrees—first degree murder and second degree murder. (§ 189, subds. (a)–(b).) First degree murder includes any "willful, deliberate, and premeditated killing," murder that is perpetrated by various statutorily-specified means, and murder committed in the perpetration or attempted perpetration of specified felonies. (*Id.*, subd. (a).) "All other kinds of murders are of the second degree." (*Id.*, subd. (b).) The punishment for first degree murder is 25 years to life in

11

prison, life in prison without the possibility of parole, or death, whereas the punishment for second degree murder is 15 years to life in prison.  (§ 190, subd. (a).)

Malice may be express or implied.  (§ 188, subd. (a).)  "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.*, subd. (a)(1).)  "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).)  Stated differently, malice is implied " ' "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Huynh* (2012) 212 Cal.App.4th 285, 314.)  " '[T]he state of mind of a person who acts with conscious disregard for life [i.e., implied malice] is, "I know my conduct is dangerous to others, but I don't care if someone is hurt or killed." ' " (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1426.)

"Under certain circumstances, malice may be implied when a defendant kills someone while willfully driving under the influence of alcohol, thus subjecting the defendant to a charge of murder.  [Citation.]  This is 'colloquially known as a *Watson* murder' after *Watson, supra*, 30 Cal.3d 290.  [Citation.]  Among other things, conviction on this basis requires a showing that the defendant had a subjective, actual awareness of the risk presented by his or her conduct.  [Citation.]  Opinions affirming convictions under this principle have relied on a number of factors … including ' "(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." ' " (*People v. Munoz* (2019) 31 Cal.App.5th 143, 152.)  All

of these factors do not need to be present for a person to be found guilty of *Watson* murder. (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 683.)

B

*The Trial Court Did Not Err in Excluding Evidence of the Alleged Sexual Assaults Perpetrated Against the Defendant*

In its in limine ruling, and at certain points during the retrial, the trial court excluded evidence of the alleged sexual assaults perpetrated against the defendant when she was a child. The court found the evidence was irrelevant and subject to exclusion under Evidence Code section 352. The defendant contends these rulings violated state evidence law and deprived her of her federal due process right to present a complete defense.

1

*The Evidentiary Rulings Did Not Violate State Evidence Law*

As a matter of state evidence law, evidence is generally inadmissible unless it is relevant. (Evid. Code, § 350; *People v. Babbitt* (1988) 45 Cal.3d 660, 681.) " 'Relevant evidence' means evidence … having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts ...." ' " (*Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1211.) An appellate court applies an abuse of discretion standard when reviewing a trial court's exclusion of evidence on relevance grounds. (*People v. Xiong* (2020) 54 Cal.App.5th 1046, 1067.)

Even if evidence is relevant and otherwise admissible, it still may be excluded pursuant to Evidence Code section 352. Under Evidence Code section 352, a court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of

13

undue prejudice, of confusing the issues, or of misleading the jury." A ruling on the admissibility of evidence under Evidence Code section 352 " ' "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 330.)

We need not decide whether the proffered sexual assault evidence was relevant because, assuming the evidence was relevant, it was properly excluded under Evidence Code section 352. The sexual assault evidence was only slightly probative, if at all, to show the defendant acted without implied malice. The prosecution did not question the fact the defendant experienced a serious childhood trauma. It did not dispute the fact she suffered severe PTSD at the time of the accident. It did not challenge the credibility of the defense experts for diagnosing the defendant with PTSD based on her accounts of the childhood trauma she endured. And the prosecution did not contest that a person with the defendant's diagnoses can have impaired judgment and may minimize the seriousness of her alcohol consumption. The defense was permitted to elicit evidence on all these issues, and it did so. While these undisputed facts may be probative to show the defendant had impaired judgment, or miscalculated the severity of her impairment on the night of the crash, the underlying *background facts* giving rise to the defendant's PTSD does not have the same probative value, if it has any at all.

The court also did not abuse its discretion in finding the probative value of the evidence was substantially outweighed by other considerations. In her opening brief, the defendant herself admits the sexual assault evidence "could [have] generate[d] some sympathy" for her. Similarly, the defendant's trial counsel admitted in open court the sexual assault evidence could "give rise to bias, sympathy or prejudice" favoring the defendant. We

14

agree with these assessments. Simply put, there was a substantial risk the proffered evidence would arouse the jury's emotions and engender undue sympathy for the defendant by casting her as a victim of tragic circumstances largely, if not entirely, unrelated to the murder charge. Such evidence is properly excluded under Evidence Code section 352. (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1064 [court properly excluded photograph showing defendant with her child because it could provoke undue sympathy].)

Other considerations warranted exclusion of the sexual assault evidence as well. The alleged sexual assaults occurred decades ago, were perpetrated by numerous different criminal actors, and took place over the course of many years on separate occasions. Given the potentially complicated nature of the testimony, as well as the fact the prosecution did not dispute the existence or severity of the defendant's PTSD, the trial court reasonably could find the admission of the sexual assault evidence would confuse the jury and necessitate an undue expenditure of time.

Even if the court's exclusion of the sexual assault evidence was error, we would conclude it was harmless in view of the overwhelming evidence of implied malice. Prior to the accident giving rise to these proceedings, the defendant suffered two DUI convictions. She attended at least one victim impact panel, a three-month educational program, and an 18-month educational program during which she heard about the dangers of drinking while under the influence of alcohol. She received numerous *Watson* advisements informing her she could be charged with murder if she killed someone while driving under the influence. Further, her ex-husband testified he spoke with her dozens of times about the dangers of drinking and driving. This evidence strongly suggests the defendant was aware of the risks of her conduct. (*People v. Murray* (1990) 225 Cal.App.3d 734, 746 ["appellant had

repeated experiences of drunk driving convictions and repeated exposures to mandatory educational programs, from which the jury could infer that appellant became aware that drunk driving is dangerous to life"].)

There was also abundant evidence of implied malice based on the defendant's conduct on the day of the accident. It is apparent the defendant had a predrinking intent to drive because she drove her vehicle to all of the locations at which she imbibed alcohol. (*Watson, supra*, 30 Cal.3d at p. 300.) She consumed so much alcohol that her BAC was four times the legal driving limit at the time she crashed into the victim's vehicle. Just minutes before the crash, the defendant's boyfriend warned her not to drive and offered to pick her up—an offer she senselessly declined. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091 [*Watson* murder conviction upheld where appellant was warned she was too intoxicated to drive and turned down offers for a safe ride].) Further, the defendant undoubtedly drove in an excessively reckless manner when she barreled the wrong way down a major roadway at 60 miles per hour, disregarded posted warning signs, and ignored another driver's fruitless efforts to get her to pull over. In view of all this evidence, the defendant has not established a reasonable probability she would have obtained a more favorable outcome if the sexual assault evidence had been admitted. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

2

*The Evidentiary Rulings Did Not Violate the Defendants' Due Process Rights*

As noted, the defendant claims the exclusion of the sexual assault evidence violated her due process right to present a complete defense, in addition to running afoul of state evidence law. " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*People v. Turner* (2020) 10 Cal.5th 786, 818.)

"Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 (*Fudge*).)

The evidentiary rulings at issue here do not rise to the level of a federal constitutional violation because the trial court did not deny the defendant a meaningful opportunity to present an implied malice defense. It permitted her to testify she believed she was not impaired on the night of the accident. It allowed her to introduce evidence she suffered a traumatic childhood event and experienced severe PTSD, depression, and alcohol use disorder. Further, it did not preclude her from eliciting expert testimony on the decision making abilities of persons who have the defendant's diagnoses. Thus, " 'there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' " (*Fudge, supra*, 7 Cal.4th at p. 1103.)

C

*The Trial Court Did Not Err in Denying the Continuance Request*

Next, the defendant contends the trial court abused its discretion and violated her due process right to retained counsel when the court denied her request to continue the sentencing proceedings. We disagree.

1

*The Trial Court Did Not Abuse its Discretion in Denying a Continuance*

In general, a party seeking a continuance of any hearing in a criminal proceeding must file and serve a written notice at least two court days before the hearing sought to be continued, together with affidavits or declarations detailing specific facts showing a continuance is necessary. (§ 1050, subd. (b).) A party may move for a continuance without complying with these procedural requirements, but must show good cause for its failure to comply.

17

(*Id.*, subd. (c).) On the merits, a showing of good cause is required to grant a continuance. (*Id.*, subd. (e).) "Thus, where a party seeking a continuance fails to comply with the notice requirements, the trial court must make a two-step decision. It must first determine whether there was good cause for failure to comply with those requirements. If there was not good cause, the court must deny the motion. [Citation.] If the court finds there was good cause for failure to comply, it must then decide whether there is good cause for granting a continuance." (*People v. Harvey* (1987) 193 Cal.App.3d 767, 771.) We review a trial court's denial of a continuance request for abuse of discretion. (*People v. Rhoades* (2019) 8 Cal.5th 393, 450–451.)

Here, the court did not abuse its discretion in denying the continuance request because the defense did not comply with section 1050, subdivision (b), and it did not make a showing of good cause excusing its failure to comply. Even if we assume Cameron-Hunsaker was incapacitated and/or preoccupied with personal matters or another trial in the weeks preceding the defendant's sentencing, or both, there is no indication in the record that her co-counsel, Demergian, was unable to prepare and file the written continuance notice required by section 1050, subdivision (b). Because we have no basis to conclude Demergian was unable to prepare the necessary continuance notice, the defense did not establish good cause for its failure to comply with section 1050, subdivision (b). (§ 1050, subd. (c).)

In her appellate briefing, the defendant asserts Demergian was not "legal counsel on the case" because he offered his services to her "pro bono." We are puzzled by this argument, which apparently assumes an attorney-client relationship cannot exist in the absence of a paid fee arrangement. That assumption is plainly wrong. (Tuft et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2020) ¶ 3:62 ["An attorney-

18

client relationship can be established when the attorney offers to investigate a case, volunteers his or her legal services or otherwise provides legal advice to a prospective client even where there is no fee agreement."].)

Indeed, it is abundantly clear from the record that Demergian had an attorney-client relationship with the defendant. He attended both trials, introduced himself to the prospective jury panels as defense counsel, was included in the caption of the defendant's court filings, argued motions on behalf of the defendant, and examined Dr. Murphy and cross-examined ten of the prosecution's witnesses during the retrial. Further, there is no indication the attorney-client relationship terminated at any point before the sentencing hearing. On the contrary, Demergian represented the defendant at the very same sentencing hearing during which he requested a continuance on behalf of the defendant. In short, there can be no reasonable dispute Demergian was a pivotal member of the defense team. He offered no explanation why *he* was unable to file the notice required by section 1050, subdivision (b). On that basis alone, the trial court properly exercised its discretion in denying the continuance request.

In the alternative, we conclude the trial court correctly determined the defendant failed to make the good cause showing necessary to warrant a continuance. The Legislature has determined "[t]he welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time," because, among other reasons, "[e]xcessive continuances ... cause substantial hardship to victims[.]" (§ 1050, subd. (a).) Here, the court reasonably could find a continuance would impose ongoing hardship on the victim's family. More than three years had elapsed since the defendant killed the victim and the victim's family had already endured two lengthy trials. The continuance

19

request was for an undetermined duration, given the court's anticipated scheduling conflicts. Further, the defense proffered no persuasive reason why Demergian was incapable of representing the defendant at the sentencing proceeding, without Cameron-Hunsaker. On these facts, the trial court properly found no good cause for the continuance request.

2

*The Trial Court Did Not Violate the Defendant's Right to Counsel*

For the reasons just discussed, we reject the defendant's claim that the denial of her continuance request violated her due process right to counsel of her choice. The defendant was represented at the sentencing hearing by counsel of her choice—Demergian. Further, as noted, there is no indication in the appellate record that Cameron-Hunsaker was solely or uniquely capable of representing the defendant's interests during sentencing. Under these circumstances, we discern no federal constitutional violation.

D

*The Trial Court Miscalculated the*
*Court Operations and Conviction Assessments*

The trial court imposed a $200 court operations assessment and a $150 conviction assessment as part of the sentence. The statute governing court operations assessments mandates the imposition of a $40 assessment per conviction for most crimes. (§ 1465.8, subd. (a)(1).) The statute governing conviction assessments requires the imposition of a $30 assessment per felony or misdemeanor conviction for most crimes. (Gov. Code, § 70373, subd. (a)(1).) As these amounts indicate, the court apparently calculated the defendant's assessments as if she had five convictions.

On appeal, the defendant contends the trial court miscalculated the court operations and conviction assessments because she had three existing

convictions, not five. The People concede the court miscalculated the assessments and urge us to modify the sentence accordingly.

We agree with the defendant and accept the People's concession. Although the jury found the defendant guilty of five counts, the trial court dismissed two of the counts (counts seven and eight) as lesser included offenses of another count (count two). Because the defendant had three extant convictions, the correct court operations assessment was $120 ($40 multiplied by three convictions) and the correct conviction assessment was $90 ($30 multiplied by three convictions). Therefore, we modify the judgment as follows: the court operations assessment is reduced from $200 to $120 and the conviction assessment is reduced from $150 to $90.

E

*The Defendant Forfeited Her Constitutional Challenges
to the Fines and Fees Based on Her Ability to Pay Them*

The trial court imposed a $10,000 restitution fine, a stayed $10,000 parole revocation restitution fine, and the previously-discussed court operations and conviction assessments without considering the defendant's ability to pay them. Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the defendant claims the court violated her state and federal due process and equal protection rights by imposing the fines and fees without assessing her ability to pay them. Alternatively, she argues the fines and fees violated the excessive fines clauses of the state and federal Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.)

"In a nutshell, *Dueñas* … held that a sentencing court violated the due process rights of a defendant who committed her acts out of poverty when it imposed certain mandatory fees and fines that lack a statutory exception without first making a finding the unemployed defendant (who suffered from cerebral palsy) had the ability to pay while she was on probation." (*People v.*

21

*Oliver* (2020) 54 Cal.App.5th 1084, 1100.) Some courts, including our court in *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), review granted Nov. 13, 2019, S257844, have rejected the *Dueñas* court's due process analysis, in whole or part, and determined that a constitutionally-based challenge to some or all statutorily-mandated fines or fees should be predicated, if at all, on the state or federal excessive fines clauses. (See, e.g., *Kopp*, at pp. 96–98, *People v. Allen* (2019) 41 Cal.App.5th 312, 326 (*Allen*); *People v. Avilez* (2019) 39 Cal.App.5th 1055, 1067–1072 (*Avilez*).)

The *Dueñas* decision was issued on January 8, 2019—14 months before the defendant was sentenced. The *Kopp* decision was issued on November 13, 2019—four months before the defendant was sentenced. And several other decisions endorsing ability-to-pay challenges under the excessive fines clauses were issued prior to the defendant's sentencing. (*Allen, supra*, 41 Cal.App.5th at p. 326; *Avilez, supra*, 39 Cal.App.5th at pp. 1067–1072; see also *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1034–1041 (conc. opn. of Benke, J.).) Thus, the law in existence at the time of the defendant's sentencing hearing supported a possible objection to the fines and fees based on the defendant's ability to pay them. Nonetheless, the defendant did not object to the fines and fees based on her ability to pay them. Because the defendant did not make an ability-to-pay objection in the trial court, her constitutional arguments are forfeited on appeal. (*People v. Keene* (2019) 43 Cal.App.5th 861, 863–864; *People v. Torres* (2019) 39 Cal.App.5th 849, 860.)

The defendant asserts several arguments to try to evade the application of the forfeiture doctrine. First, she claims the trial court misunderstood the scope of its discretion to impose the fines and fees at issue. " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is

unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  However, "[i]n the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361), and " ' "error must be affirmatively shown" ' " (*People v. Giordano* (2007) 42 Cal.4th 644, 666).  The defendant has not directed us to any portion of the appellate record indicating the trial court misunderstood the law or the scope of its discretion.  Because we must presume the court correctly applied the law, the defendant's first argument necessarily fails.

Next, the defendant argues the court exceeded its authority by imposing the fines and fees, producing an unauthorized sentence that may be corrected on appeal notwithstanding her failure to object.  An unauthorized sentence exists "when the trial court has imposed a sentence that 'could not lawfully be imposed under any circumstance in the particular case.' " (*People v. Anderson* (2020) 9 Cal.5th 946, 961.)  It may be corrected on appeal because it "present[s] [a] 'pure question[] of law' [citation], and [is] ' "clear and correctable" independent of any factual issues presented by the record at sentencing.' " (*People v. Smith* (2001) 24 Cal.4th 849, 852.)  Contrary to what the defendant claims, the fines and fees at issue here *could* lawfully be imposed if she had the ability to pay them.  Further, a factual determination concerning her ability to pay would be needed to decide whether the fines and fees were permissible.  For both of these reasons, we conclude the fines and fees at issue did not produce an unauthorized sentence that we may correct on appeal.  (*People v. Jinkins* (2020) 58 Cal.App.5th 707, 713; see *People v.*

23

*Avila* (2009) 46 Cal.4th 680, 729 [rejecting claim that sentence was unauthorized because defendant did not have ability to pay restitution fine].)

Finally, the defendant argues she received ineffective assistance of counsel because her trial counsel did not object to the fines and fees on due process, equal protection, and/or excessive fines grounds. To prove ineffective assistance of counsel, a defendant must "demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result." (*People v. Dennis* (1998) 17 Cal.4th 468, 540–541; see *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

We reject the defendant's ineffective assistance of counsel argument because she has not established that her trial counsel acted deficiently. " 'If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125.) The record does not disclose why the defendant's counsel declined to object to the fines and fees, and he was not asked for an explanation he failed to provide. Further, we can easily conceive of explanations for counsel's decision not to object. Most notably, he could have declined to object to the fines and fees because he knew the defendant had the ability to pay them or, at minimum, that the defense would be unable to prove otherwise at an ability-to-pay hearing. Because there are satisfactory explanations for counsel's conduct, the defendant has not established ineffective assistance of counsel.

IV

DISPOSITION

The judgment is modified as follows:  the court operations assessment (§ 1465.8) is reduced from $200 to $120 and the conviction assessment (Gov. Code, § 70373) is reduced from $150 to $90.  The judgment is affirmed as modified.

The clerk of the superior court is directed to amend the abstract of judgment to reflect this modification and to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


GUERRERO, J.

25